UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff & Respondent,<br><br>v.<br><br>HAGOP VARTANIAN,<br><br>Defendant & Petitioner. | 1:01-CR-05069-OWW<br>1:08-CV-01101-OWW<br><br>MEMORANDUM DECISION RE:<br>PETITIONER HAGOP VARTANIAN'S<br>MOTION TO VACATE, SET ASIDE OR<br>CORRECT SENTENCE PURSUANT TO<br>28 U.S.C. § 2255 |

## I. <u>INTRODUCTION</u>

Before the Court is Petitioner Hagop Vartanian's "Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255," filed July 31, 2008.[1]   The United States has filed opposition, to which Petitioner has replied.

## II. <u>BACKGROUND</u>

On March 19, 2003, Petitioner was convicted by a jury on two counts of aiding and abetting the filing of a false tax return, in violation of 18 U.S.C. § 2 and 26 U.S.C. § 7206(1), and two counts of aiding and abetting the making of false statements on a loan application to a federally insured financial institution, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 1014.   The jury

---

[1] References to section numbers refer to sections of Title 28 of the United States Code unless otherwise specified.

**1**

1   unanimously found that Petitioner had willfully filed false tax
2   returns for the 1994 and 1995 tax years. (See Form of Verdict,
3   Doc. 65, filed March 19, 2003.) The jury also found that
4   Petitioner made false statements or reports on a loan or credit
5   application for the purpose of influencing the action of Sierra
6   Thrift, a federally insured institution. (Id.)

7       Following the jury verdicts, as part of the sentencing
8   proceedings the District Court held a series of evidentiary
9   hearings to determine the amount of the tax loss suffered by the
10  United States as a result of Petitioner's violations.[2] The tax
11  loss was determined to be in the amount of $25,093 for 1994 and
12  $79,335 for 1995, aggregating a total tax loss of $104,428. (See
13  "Order Re: Amount of Tax Loss," Doc. 160, filed July 13, 2005.) On
14  July 6, 2005, Petitioner was sentenced to a concurrent sentence of
15  fifteen months in federal prison, based on an adjusted offense
16  level of fifteen.[3] (Doc. 156; Reporter's Tanscript ("RT"), July 6,
17  2005, 129:16-131:13.) Petitioner's sentence was not adjusted under

18
19
20

21      [2] The amount of tax loss was determined by evidentiary
22  hearings before the District Court on December 8, 2003, January 13,
    2004, January 21, 2004, January 27, 2004, June 30, 2005, and July
23  6, 2005. Petitioner was sentenced on the last day of evidentiary
    hearings, July 6, 2005. Petitioner's tax loss figure related only
24  to Petitioner's unreported income from Pacific Sales & Leasing. It
    was determined at sentencing that the government failed to prove,
25  by clear and convincing evidence, that Petitioner received any
26  income from Muscles-N-Motion or from bookmaking activities.

27      [3] Petitioner's base offense level was calculated to be
    fourteen - under U.S. Sentencing Guideline 2T4.1, which controls
28  tax losses of more than $70,000 but less than $120,000.

§ 3553.[4]  (Id.)

On  July 11, 2005, Petitioner filed a notice of appeal of his conviction and sentence to the Ninth Circuit.  Petitioner's conviction and sentence were affirmed on appeal, *United States v. Vartanian,* 476 F.3d 1095 (9th Cir. 2007).  The Ninth Circuit denied Vartanian's petition for a hearing *en banc* on May 15, 2007 and the United States Supreme Court denied his petition for writ of certiorari on October 1, 2007.

The instant motion to vacate, correct, or set aside the sentence pursuant to section 2255 was filed on July 31, 2008.

## III.  <u>JURISDICTION</u>

Section 2255 provides, in pertinent part: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside or correct the sentence."  Under section 2255, "a district court must grant a hearing to determine the validity of a petition brought under that section, '[u]nless the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  *United States v. Blaylock*, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255).  The court may deny a hearing if the petitioner's allegations, viewed against

---

[4] As part of his sentence, Petitioner was also ordered to serve 36 months of supervised release, fined $10,000, and assessed a $400 penalty.  (See "Judgment and Commitment," Doc. 157, filed July 11, 2005.)

**3**

the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal." *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996) (internal quotations omitted), cert. denied, 520 U.S. 1269 (1997). To earn the right to a hearing, therefore, the petitioner must make specific factual allegations which, if true, would entitle him to relief. *Id.* Mere conclusory statements in a section 2255 motion are insufficient to require a hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980), cert. denied, 451 U.S. 938 (1981).

## IV. **DISCUSSION**

Petitioner's motion aaserts that his trial and sentencing counsel, Mr. Anthony Capozzi, rendered ineffective assistance by: (a) failing to adequately comprehend and present evidence concerning the "bank deposit method" at trial; (b) failing to adequately comprehend and present evidence concerning tax loss at sentencing; and (c) failing to adequately provide the Court with "extraordinary circumstances" justifying a downward departure and a sentence of less than 12 months.[5]

To establish a constitutional violation for the ineffective assistance of counsel, a defendant must demonstrate: (1) a deficient performance by counsel, and (2) prejudice to him.

---

[5] Under the third ground for relief, Petitioner also argues that counsel failed to adequately provide the court with relevant authority regarding the immigration consequences of a sentence exceeding 12 months. This argument is addressed in § IV(C), *infra*, as part of Petitioner's primary claim that his counsel failed to adequately provide downward departure evidence.

**4**

*Strickland v. Washington*, 466 U.S. 668, 689 (1984); *United States v. Cochrane*, 985 F.2d 1027, 1030 (9th Cir. 1993). To prove deficient performance of counsel, Petitioner must demonstrate that her attorney "made errors that a reasonably competent attorney acting as a diligent and conscientious advocate would not have made." *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir. 1985). Courts considering ineffective assistance of counsel claims "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *United States v. Jeronimo*, 398 F.3d 1149, 1155 (9th Cir. 2005).

To show prejudice, Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A court addressing a claim of ineffective assistance of counsel need not address both prongs of the *Strickland* test if the petitioner's showing is insufficient as to one prong. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*.

**A.   Failure to Comprehend "Bank Deposit Method" at Trial**

Petitioner's first challenge is that counsel was ineffective because he "lacked the basic competence to understand that Revenue Agent Gathright's grossly erroneous tax loss calculations resulted from an improper application of the bank deposits method." According to Petitioner, his counsel's material confusion over the

**5**

bank deposits method caused counsel to be unable to "recognize what the government was attempting to do, and what the government did to defendant." Petitioner argues that his defense counsel was ineffective for failing to understand the bank deposit reconstruction method, and in failing to secure the necessary tax and accounting experts to rebut the testimony of Mr. Gathright, the government's trial witness on income reconstruction.[6]

Petitioner's attack on his defense counsel's tax and accounting approach and the experts he presented at trial does not constitute deficient performance under the first prong of *Strickland*. As both parties point out, Petitioner's counsel retained a tax and accounting expert to rebut Gathright's trial testimony and to establish that there was no tax loss in 1994 or 1995. (Doc. 203, 19:5-20:9; Doc. 1, 23:3-24:23.[7]) Petitioner's trial expert, Mr. Joseph Mastro, was a former IRS agent with twenty years of business and tax accounting experience. Mastro, a certified public accountant, was experienced in the field of income reconstruction and, specifically, with the bank deposit method. At trial, Mastro testified that he had previously used the bank deposit method "several hundred times," and that it was "almost a

---

[6] In circumstances where, as here, the taxpayer did not maintain accurate and reliable accounting records and information, the bank deposit method is an acceptable basis for determining income to establish the existence of an income tax deficiency. *See United States v. Stone*, 770 F.2d 842, 844 (9th Cir. 1985) (holding that the government may use the bank deposit method to establish a deficiency to support a conviction for attempted income tax evasion).

[7] References to "Doc. 1" relate to Case No. 1:08-CV-01101-OWW (Petitioner's habeas case). All other docket entries relate to Case No. 1:01-CR-5069-OWW (Petitioner's criminal case).

standard procedure:"

> One of the first things you do is you total all of the deposits to the bank. That is just the starting point. Then you compare it to the tax return. If you come up with a difference, then the next step, that's where you begin, that's the beginning, not the end of it. Then you either have to sit down with the taxpayer and try to determine which items, discrepancies, everything. You would back out all the wages, loans, gifts, inheritances, anything like that that's a nonincome item.
>
> Then once you resolve all of that, if there is still a difference, then you would proceed on. But it's – you have to eliminate all nonincome items. But while you are doing that it's also the duty of the revenue agent to determine if any taxes, any expenses are missing. You can't be one-sided. It wouldn't be fair to say you omitted income but forget the expenses you omitted. That's one-sided and you are not allowed to do that. It has to be done simultaneously.
>
> If you are doing this audit and you see that expenses are missing, you add that income on. It can't be one-sided.

(RT, March 13, 2003, 1510:11-1511:6.)

Petitioner's primary contention is that trial counsel rendered ineffective assistance by "failing to come up with the correct bank deposits calculation that would have resulted in little or no tax loss." (Doc. 203, 26:22-26:25.) Based on the trial record, however, this is the exact strategy developed during counsel's direct examination of Mastro on March 13, 2003.[8] On direct

---

[8] In *U.S. v. Boulware*, 384 F.3d 794, 810 (9th Cir. 2004), the Ninth Circuit stated: "[t]he critical question [in examining the bank deposit method] is whether the government's investigation has provided sufficient evidence to support an inference that an unexplained excess in bank deposits is attributable to taxable income." Although the government must be especially thorough in its investigation and presentation, "it is well settled that the government is not obliged to prove the exact amount of a deficiency so long as the taxpayer's understatement of income is substantial." *Id.* at 810. Like the government witness in *Boulware*, IRS Agent

examination, Mastro testified that Petitioner had little or no tax loss in 1994 or 1995 and that the government's analysis was flawed. Mastro's critique of the government's analysis focused on the alleged improper inclusion of non-income items in "gross bank deposits" and undervaluing expenses, specifically, costs of goods sold.   According to Mastro, these two miscalculations inflated (overstated) Petitioner's federal tax liability for tax years 1994 and 1995.

Concerning Petitioner's 1994 tax liability, trial counsel introduced a chart prepared by Mastro setting forth the errors in the government's bank deposit analysis.[9]   Mastro concluded that

---

Gathright testified that he eliminated any identifiable loans - as well as other identifiable non-income items - that may have originated from any of Petitioner's businesses.   The issue of "counting non-income items as income" was heavily disputed by Petitioner's counsel and CPA Mastro.  However, the trial record conclusively demonstrates that the government's evidence on this issue was more than adequate to support the inference that the defendant's bank deposits were income from Petitioner's businesses and were in fact currently taxable but unreported income. *Id*. at 811.

[9]   In *United States v. Miller*, 545 F.2d 1204, 1213 (9th Cir. 1976), *abrogated on other grounds by Boulware v. United States*, 552 U.S. 421 (2008), the Ninth Circuit established that: "the defendant ha[s] the burden of going forward once the government demonstrates that the taxpayer had unexplained funds which could be considered as income which the taxpayer fails to report in his return."   In this case, Counsel's - and CPA Mastro - strategy was to rebut this burden by establishing that the many of the "unexplained items" were actually loans and erroneously included as income.   This is a common strategy in criminal tax cases applying the bank deposits method.   *See, e.g.*, *Boulware*, 384 F.3d at 811; *accord Choi v. C.I.R.*, 379 F.3d 638, 640 (9th Cir. 2004) ("The Chois argu[e] that the Commissioner did not properly subtract all nontaxable amounts ... [t]hey contend that many of the bank deposits consisted of nontaxable amounts because the grocery store cashed payroll checks for its customers without charging a fee when the customer also

total taxable income for 1994 was -159,796.34.[10]  According to the government, Plaintiff's 1994 tax liability was $59,446, based primarily on deposits of 840,215.93 and costs of $530,944.[11]  Mastro attributed the discrepancy to fundamental errors in calculating income and costs of goods sold:

> Q.  All right. And then you took that number and you start out with that number; is that correct?
>
> A.  That is correct.
>
> Q.  Then what did you do?
>
> A.  Then what you tried to do is reconcile that number, first of all, by trying to determine if all of the deposits that included in that item are an income item in fact.
>
> Q.  What do you mean by that?
>
> A.  Well, suppose like in that $157,000 there was loan proceeds.  Well, that's not an income item. That should have been eliminated.
>
> Q.  A loan proceed is not income?
>
> A.  No, never has been.
>
> Q.  Then what about the next line here, you have – tell us what that is.
>
> A.  The next line is cost of goods sold for Pacific

purchased groceries.").

[10] As to the 1994 tax year, Gathright testified that Petitioner had unreported income of $157,126.93 and additional tax owing of $54,620.  In 1995, Gathright testified that Petitioner had unreported income of $379,753.13 and owed $148,912 in additional tax.  (Doc. 1, Exh. 1.)

[11] As explained in § IV(B), *infra*, the tax evidence presented at trial and sentencing related to Petitioner's unreported income from Muscles-N-Motion, Pacific Sales & Leasing, and bookmaking activities.  In contrast, Petitioner's habeas motion primarily focuses on the errors associated with unreported income from Pacific Sales & Leasing, a used car business operated by Petitioner and his brother.

Sales and Leasing.  That referred to the cost of acquisition of autos for resale.

Q.   Now, how did you determine that?

A.   What I did is I tried – I got information from third party sources like auto dealerships that he dealt with, and they provided me with the total amount of auto purchases for the year 1994 [...]

Q.   And did you total those figures?

A.   Correct, and I just ran a tape of all of the purchases and compared them to what was shown on the 1994 schedule C for Pacific Sales and Leasing [...]

Q.   This number, 724,000, tell us what that is, that's the cost of all the purchasing goods or sales?

A.   That represents the cost of automobiles purchased for the year 1994, and that was obtained from third-party sources [...]

Q.   Okay.  So the cost of goods for Pacific Sales was that amount.  700 and some thousand?

A.   That is correct.

Q.   Then you have a next line.  What's the next line?

A.   Cost of goods sold Pacific Sales and Leasing per 1994 tax return schedule C refers to a schedule that is on the tax return which shows, this is the amount of cost – auto purchases for the year 1994

Q.   I'm sorry, did that come the tax return filed with the IRS?

A.   Correct [...]

Q.   What did you do then?

A.   I took the difference in the two numbers and that number is $244,854 of costs and that's not reflected on this particular schedule C for the year 1994.

Q.   Explain that in everyday terms so we can understand what you said.

A.   Well, in everyday terms, that would mean that auto sales, cost of auto sales or the cost of

**10**

1        cars purchased is understated based on the
2        information presented to me.   That's what it
         means [...]

3    Q.   So are you saying you went out with the people
         that sold the cars to Pacific Sales, total cost
4        was $724,000?

5    A.   That's correct.

6    Q.   But the total cost on the tax return that was
         filed was only $479,000; is that correct?
7
     A.   That is correct [...]
8
     Q.   So there is a negative $244,000?
9
     A.   That is correct.
10
     Q.   Is that the only negative?
11
     A.   That's one of the adjustments.
12

13   (RT, March 13, 2003, 1514:22-1518:25.)

14        Mastro produced another chart and performed a similar analysis

15   for 1995.   Mastro testified that Gathright undervalued Pacific

16   Sales and Leasing's costs of goods sold in 1995 by approximately

17   $527,941. According to Mastro, Pacific's cost of goods sold for

18   1995 was $1,080,994, not the $553,053 reported on the tax return

19   and used in the Gathright's analysis:

20   Q.   Then do you subtract the two of those?

21   A.   The difference, $527,941, that represents
         additional cost of autos acquired in the year.
22       What I'm saying is that it should have been
         1,080,994, not $553,053 [...]
23
     Q.   The expenses were understated by approximately
24       $527,000?

25   A.   That is correct.

26   Q.   Based on your analysis, is there a tax due?

27   A.   Same scenario here.   There is, by adding back
         these additional costs of autos, it creates a net
28       operating loss in the amount of $198,152.87 which

**11**

> results in no tax due.  And based on what was filed, there would have been an overpayment in the amount of $9,117.

(Id. at 1529:23-1530:11.)

In this case, trial counsel's performance was not deficient under the first prong of *Strickland*.  Trial counsel presented the testimony of forensic accountant Joseph Mastro, a CPA and former IRS agent with twenty years of accounting experience.  Mastro provided expert trial testimony on the key elements of Petitioner's defense: the issue of tax loss, the government's errors concerning the amount of total expenses, and the recalculation of cost of goods sold to reduce the amount of taxable income.  The record clearly demonstrates that counsel's actions and conduct at trial were within "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  A major problem for Petitioner was the substantial evidence of how he operated his business, relying on others; claiming ignorance of any and all financial details, failing to keep records, and lying in two categorically false loan applications submitted under penalty of perjury.  This provided the jury with good reason not to accept or believe Petitioner's evidence.

Petitioner also argues his counsel's alleged lack of understanding concerning the bank deposits method resulted in a failure to subject Revenue Agent Gathright to a meaningful cross-examination at trial.  However, the trial record forecloses Petitioner's contention.  The record shows that defense counsel's cross-examination focused on alleged errors in Gathright's bank deposit calculations, namely Gathright's alleged inclusion of non-

**12**

income items and undercounting of total expenses.  Counsel also asked several questions of Gathright at trial concerning whether the Vartanians' Pacific Sales and Leasing's bank account acted as a "clearinghouse" used by several businesses and family members. Counsel's rigorous cross- examination of Gathright at trial was designed to support the theory that Petitioner had little or no taxable income in 1994 and 1995 after reconstructing cost of goods sold, the foundation for which was developed during Mastro's direct examination.

What Petitioner ignores is that he created the problem by non-existent record keeping, approaching deliberate ignorance, of any of the financial or business ramifications of the operations of his various businesses.  He testified that he relied on others to take care of accounting details, however, his bookmaker's testimony showed an almost total lack of care by Petitioner.  Counsel had nothing to do with creating these problems.  Petitioner had a duty to keep adequate records, which he did not do.

Under *Strickland*, relief is not warranted if "counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.  Here, counsel extensively cross-examined Gathright, eliciting alleged miscalculations concerning how he reconstructed income and expenses under the bank deposits method.  Counsel also introduced an accounting expert to identify and describe the government's miscalculations and provide what he determined were correct figures for total deposits and costs of goods sold. By pursuing this line of defense, defense counsel adopted a reasonable strategy that, if believed, would have demonstrated that Petitioner had little or no tax liability in 1994 and 1995.  This assistance

**13**

was not defective.

The uncertainty and almost total absence of lack of accounting records was Petitioner's fault.  He claimed to be unable to read or write and to be dependent on others to help him run his businesses. Yet he did almost nothing to see that regular accounting records were kept during each business year.  The almost total absence of business records for Petitioner's businesses is what caused the need to reconstruct income and expenses to rebut the government's bank deposit method.  None of this was the fault of counsel.  More importantly, Petitioner's evasive testimony, lack of knowledge about business records, and deliberate ignorance about the financial details of his businesses seriously impaired his credibility before the jury.

Because Petitioner's counsel's representation at trial did not fall below an objective standard of reasonableness, there is no need to examine the prejudice prong of the *Strickland* analysis. *See Strickland,* 466 U.S. at 697 (noting that courts may consider either prong of the test first and need not address both if the defendant fails one).  Petitioner's federal habeas petition is DENIED on his first ground for relief.

**B.**   **Failure to Comprehend "Bank Deposit Method" at Sentencing**

   **1.**   ***Introduction***

The substance of Petitioner's second habeas challenge is that he received ineffective assistance of counsel at sentencing, because his counsel did not "understand" the government's accounting analysis, bearing on the amount of tax loss, which resulted in calculations that Petitioner owed considerable unpaid

tax in 1994 and 1995.  According to Petitioner, if counsel was competent, he would have noticed the government's miscalculations and introduced evidence establishing his innocence or, at the very least, mitigating his sentence to one lower than fifteen months. Petitioner's specific grievance is that his counsel was ineffective because he failed to understand the government's "erroneous accounting mechanisms ... which bore no relationship to proper bank deposits analysis."[12]

However, regardless of any purported deficiencies in the government's tax analysis at sentencing, Petitioner fails to demonstrate that trial counsel's sentencing performance was patently deficient and fell below an objective, reasonable standard.  Counsel well understood the issues raised by the government's evidence, most of which focused on the lack of records for the auto sales, bookmaking and dance businesses and the government's inability to prove income from these enterprises with any reasonable certainty, which ultimately led the court to find no unreported income for either of the latter two ventures.  This was accomplished by defense counsel calling an accounting expert, a gambling expert, witnesses who operated the bars who paid the dancers, and dancers who received income from Petitioner.  His accounting experts raised sufficient questions to require a five day evidentiary hearing directed to establishing the amount of tax loss.  All of this was caused by Petitioner's irresponsibility, if

---

[12] Petitioner contends that "any competent lawyer would have seen ... that the method used by Gathright defies common sense, i.e., no matter what your method, you don't double count income items like Gathright did."

not  deliberate  omission,  in  abdicating  his  record  keeping
responsibilities.

In  this  case,  any  claim  of  ineffective  assistance  is
unpersuasive given the significant tax loss evidence presented by
Petitioner's  counsel  and  his  tax  experts  during  the  post-trial
evidentiary hearings and at sentencing.  Petitioner's *Strickland*
claim  is  precluded  based  on  his  counsel's  competence,  which  the
sentencing  record  clearly  demonstrates.

### 2.  *Background*

In  support  of  his  motion,  Petitioner  provides  a  52-page
memorandum  containing  three  newly-minted  expert  opinions.[13]   The
opinions  provided  by  Petitioner's  new  round  of  experts  are  limited
to  the  purported  tax  analysis  applied  to  Petitioner's  income  from
Pacific Sales & Leasing.[14]   The  first  expert,  CPA  Howard  Gastwirth,

---

[13] As  an  initial  matter,  Petitioner's  § 2255  motion  provides
an  inaccurate  and  incomplete  recitation  of  the  facts.   As  the
government  correctly  observes,  Petitioner  fails  to  mention  the  six
days  of  post-trial  sentencing  evidentiary  hearings  held  by  the
District  Court  to  determine  the  amount  of  the  tax  loss  suffered  by
the  United  States  as  a  result  of  Petitioner's  violations.   Critical
to  this  oversight  is  Petitioner's  omission  of  the  testimony  of  Mr.
Dennis  Bean,  another  tax  expert  retained  by  Petitioner's  counsel,
and  who  testified  on  Petitioner's  behalf  at  sentencing.
Petitioner's  motion  also  does  not  refer  to  his  "Sentencing
Memorandum,"  filed  on  March  11,  2004,  where  Mr.  Bean  declared  that
the  government  incorrectly  applied  the  cash  method  of  accounting  at
sentencing,  which  should  not  have  been  applied  to  a  used  car
business.

[14] Petitioner's  habeas  motion  focuses  on  the  alleged  tax  errors
associated  with  Petitioner's  failure  to  report  income  from  Pacific
Sales & Leasing.   The  government  did  not  establish,  by  clear  and
convincing  evidence,  that  Petitioner  failed  to  report  income  from
Muscles-N-Motion  dance  business  and  bookmaking  activities.   Also,
the  government  did  not  did  not  allege  that  Petitioner  failed  to

reconstructed Pacific Sales & Leasing's gross profit and tax liabilities for 1994 and 1995 using the auto industry's gross profit percentages as analytical guideposts.  Using articles from the auto industry, which were not available at trial or sentencing, Gastwirth determined that the average gross profit on used car dealerships ranged from 11% (franchise dealer) to 16.8% (independent dealer).  Gastwirth concluded that the government's analysis was flawed - its profit margin for Petitioner's income exceeded industry averages, i.e., did not fall within the 11% to 16.8% range - and Pacific Sales & Leasing's gross profit was actually over-reported by $6,159 for the 1994 and 1995 tax years.[15]

Petitioner also retained experts James L. Judd and Wayne A. McEwan to analyze the government's tax analysis.  Judd is a retired criminal tax technical advisor for the IRS and McEwan is a former Senior Chief for the IRS.  Neither Judd nor McEwan is a certified public accountant.  According to their joint declaration, Judd and McEwan were retained to "analyze and opine on the bank deposit method used by the government to reconstruct unreported income for Mr. Vartanian."  Judd and McEwan aver that "Gathright's calculation

report income from Varco Pressure Wash, a separate entity owned by Petitioner during 1994 and 1995.

[15] Gastwirth states that Petitioner's income was under-reported by $17,531 in 1994 and over-reported by $23,690 in 1995, within industry ranges for used automobile dealerships (13.3% in 1994 and 7.1% in 1995).  Based on Gastwirth's theory, the government's analysis resulted in profit margins of 19.9% in 1994 and 23.6% in 1995, outside the ranges for used automobile dealers.  This theorizing by comparison to "industry" ranges does not account for the local Fresno auto market or Petitioner's unique business operation, nor provide an immutable standard by which to calculate Pacific Sales & Leasing's income and expenses.

of unreported income is flawed because he mixed accounting methods when calculating his bank deposit summary [which] ... do[es] not truly reflect Petitioner's actual unreported income for sentencing purposes."   Judd and McEwan concluded that Petitioner is owed a refund of $34 for tax overpayment for 1994 and owes an additional tax of $2,355 for the 1995 tax year.

It is important to note the progression of Petitioner's document production and its effect on the accounting methods used by the parties during the different stages of Petitioner's case, i.e., first at trial, second, during the post-trial evidentiary hearings for sentencing, and, last, for his current habeas petition.   At trial, because Petitioner's business records were virtually non-existent, the government used the bank deposit method to compute his income and tax liabilities.[16]   Mr. Gathright, the government's accounting expert, testified that under the bank deposit analysis Petitioner owed an additional tax of $54,620 in 1994 and $148,912 in 1995.   To rebut Gathright's testimony, Petitioner utilized CPA Mastro, who conducted his own bank deposit analysis, and testified that Petitioner had little or no tax loss in 1994 or 1995 and that the government's bank deposit analysis was flawed.   Consequently, the jury was presented with the traditional battle of experts expressing opposing views on the ultimate question of unreported income.

Following his conviction on March 19, 2003, before sentencing, Petitioner retained the services of Dennis Bean, a CPA and former

---

[16] At trial, Gathright testified that Petitioner received unreported income - and owed additional tax - from Muscles-N-Motion, Pacific Sales & Leasing, and bookmaking.

**18**

IRS Agent. Mr. Bean reconstructed the books and records of Muscles-N-Motion, Pacific Sales & Leasing, and bookmaking venture operating out of Pacific Sales & Leasing based on a combination of third party documents and records provided to him by Petitioner. These reconstructed books and records were not available during trial. According to Bean, the availability of these records rendered the bank deposit method inapplicable. Under Bean's analysis, which was a hybrid method of income reconstruction, Petitioner's total income tax due was $1,921 in 1994 and credit due (-$6,428) in 1995.[17]

The government countered that based on the absence of Petitioner's accounting records, the books and records were not recreated until after trial, were incomplete and inaccurate, and could not be accepted on their face. However, without conceding their accuracy, Gathright reconstructed Petitioner's income using Bean's figures. Gathright, who applied a similar hybrid reconstruction method - which was introduced by CPA Bean, testified that there was unreported income of $55,203 in 1994 and $206,886 in 1995.

Petitioner's counsel called additional witnesses to rebut the government's contentions that Petitioner was liable for unpaid taxes on unreported income from Muscles-N-Motion, bookmaking, and Pacific Sales & Leasing. As to the Petitioner's purported involvement with bookmaking, counsel for Petitioner called Arthur

---

[17] Bean determined that Pacific Sales & Leasing's net profit in 1994 and 1995 was $16,666 and (-$3,540), respectively. After backing out loans, commissions, expenses, and itemized deductions, he determined Petitioner's income to be $1,921 in 1994 and (-$6,428) in 1995.

Lewis, an expert on bookmaking, as well as Ronald Hertz, Allison Justesen, and Richard Mardiros, who minimized gambling income. Also testifying on Petitioner's behalf was David Ochoa, who operated Chiquito's nightclub and testified that he did not pay Petitioner to supply dancers to his nightclub during the relevant periods.

Petitioner was sentenced following six days of evidentiary hearings, on July 6, 2005. The court determined that the government failed to prove, by clear and convincing evidence, that Petitioner had unreported income from Muscles-N-Motion and from bookmaking in the 1994 and 1995 tax years. However, as to Pacific Sales and Leasing, the government established $83,503 of unreported income attributable to Petitioner for the 1994 tax year. This resulted in an unpaid tax liability of $25,093. As to the 1995 tax year, the government established $234,274 of unreported income from Pacific Sales and Leasing, corresponding to unpaid tax of $79,335 for 1995 and a total unpaid tax of $104,428 for the 1994-95 tax years.

### 3. *Analysis*

Petitioner argues that his counsel's misunderstanding of the "bank deposits method" at sentencing was so manifest that it violated *Strickland*. To support his motion, Petitioner asserts that "the errors of counsel had nothing to do with trial strategy or strategic decisions." According to Petitioner, "the errors were a series of blunders all well outside the wide range of professionally competent assistance."

This post hoc reasoning ignores the trial and sentencing

proceedings and instead offers a "perfect" defense scenario based on the 20-20 vision of hindsight implemented by Monday morning quarterbacks, the new experts.  The entire record reveals that both tax experts - Mr. Bean for the defense and Mr. Gathright for the government - applied a hybrid reconstruction method at sentencing, not the bank deposits method Petitioner claims should have been applied.  Gathright and Bean used hybrid reconstruction methods at sentencing because Bean had to reconstruct Petitioner's income and expenses from reconstructed books and records created following the jury convictions on March 19, 2003.  Conversely, Gathright and CPA Mastro, Petitioner's original tax expert, applied a bank deposits method at trial because Petitioner's bank records were not available due entirely to Petitioner's misfeasance and inattention to generally accepted record keeping requirements.

Petitioner also contends that trial counsel was deficient because he was "unable to come up with the correct bank deposits calculation that would have resulted in little or no tax loss." However, the record reveals, and Petitioner overlooks, that his first tax expert, CPA Mastro, and second tax expert, CPA Bean, both determined that Petitioner had little or no tax loss for the 1994 and 1995 tax years.  CPA Mastro, applying a bank deposits method and the cash accounting method, determined that Petitioner's business had operating losses in 1994 and 1995, resulting in tax overpayments in both years.[18]    CPA Bean, applied a hybrid

---

[18] The jury did not accept this testimony and was fully justified in finding Petitioner to be a highly incredible witness, whose derelictions were the cause of the need to reconstruct income and expenses.  The jury could well believe that Petitioner's failed to keep records to avoid responsible and accurate tax accounting.

reconstruction analysis and an accrual-type accounting method, to determine that Petitioner had a total income tax due of $1,921 in 1994 and an overpayment of $6,428 in 1995.[19]

In this context, the true focus of Petitioner's habeas challenge comes to light: that the government impermissibly combined or mixed accounting methods to determine Petitioner's unreported income. Although Petitioner's counsel repeatedly raised this argument during sentencing, Petitioner now asserts that his counsel was constitutionally deficient for doing what it is claimed he did not do based on the government's impermissible "mixing" of accounting methods. To validate his assertions, Petitioner submits the joint declaration of Judd and McEwan, which states that the government's use of two separate accounting methods led to an overstated tax liability, something that Petitioner's counsel allegedly failed to adequately address:

> When you analyze Mr. Gathright's bank deposit computation it is clear that he computed his additional taxable income figured by combining information that was derived from two separate accounting methods. He used the cash method to determine the amount of automobile sales included in Mr. Vartanian's bank deposits and then he calculated additional unreported sales using reconstructed records of Pacific Sales & Leasing that were compiled using the accrual method of accounting. Mr. Gathright took the reconstructed auto sales figure that was provided by the PS&L defense team, and subtracted a figure for accounts receivable, that was also a reconstructed figure by the PS&L defense team using the accrual method of accounting. This calculated figure was labeled Cash available from Sales/Collection and was subtracted from Total Deposits for each year in the government's bank deposit analysis.

---

[19] Petitioner's habeas experts admit he owed taxes for unreported income in 1994 (Gastwirth) and 1995 (Judd and Robbins).

(Doc. 204, Ex. E, pg. 3) (citations omitted).

Based on the sentencing record, it is apparent that Petitioner's argument is meritless. First, although Petitioner focuses on the difference in accounting methods, it was his own failure to maintain business records which led to the need to apply the bank deposit method at trial *and* to use a hybrid reconstruction method at sentencing. It is well-established that "where taxpayer fails to maintain adequate records, the government, in attempting to establish a violation of income tax law, may reconstruct taxpayer's taxable base by any reasonable method." *Stuart v. United States*, 337 F.3d 31, 35 (1st Cir. 2003); *see also Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005) ("[T]he taxpayer who has failed to maintain adequate records has a deep row to hoe in order to upset the government's method, rough as it necessarily is, of assessment in such a case."); *Choi v. C.I.R.*, 379 F.3d 638, 640 (9th Cir. 2004) ("Where the taxpayer fails to maintain adequate records for the government to determine the amount of actual income, the government may use indirect methods to establish income."); *Palmer v. United States IRS*, 116 F.3d 1309, 1312 (9th Cir. 1997) ("Courts have long held that the IRS may rationally use statistics to reconstruct income where taxpayers fail to offer accurate records."). Petitioner, based on his lack of document preservation and record keeping, can only blame himself for the resulting application of the bank deposits method at trial and a hybrid reconstruction method at sentencing.[20]   What is also

---

[20] As stated by the Eight Circuit in *Dodge v. C.I.R.*, 981 F.2d 350, 353 (8th Cir. 1992), "when taxpayers fail to file returns or when they file returns substantially understating their income, and

1  undeniable is that substantial evidence showed illegal gambling

2  activities were conducted at Petitioner's Pacific Sales & Leasing

3  business, involving large sums of money, often in Petitioner's

4  presence.  This afforded Petitioner a substantial incentive to not

5  keep accurate records and the jury had a valid basis to believe

6  Pacific Sales & Leasing was being utilized as a "front" for illegal

7  bookmaking and gambling, for which no business records were

8  maintained.

9      Applying the first prong of *Strickland*, Petitioner's challenge

10  fails for another reason, namely that the record clearly

11  establishes that Petitioner's counsel presented competent and

12  comprehensive tax, accounting, income reconstruction, and expert

13  evidence during the post-trial evidentiary hearings and at

14  sentencing.  Critical to this showing is that the arguments now

15  advanced by Petitioner's habeas experts are nearly identical to the

16  arguments presented on Petitioner's behalf - by his defense counsel

17  and tax experts - during three separate and distinct post-trial

18  stages of his criminal case: (1) in Petitioner's March 11, 2004

19  Sentencing Memorandum; (2) during the six days of evidentiary

20

21  cannot produce records which provide the arithmetic precision ...

22  originally and exclusively in their hands, an assessment is
    necessarily an estimate.  As long as the method for assessment is

23  reasonable and logical, defaulting taxpayers may not complain of
    the inevitable inaccuracies in assessment their default occasions.

24  Faced with nearly $700,000 deposited over a four-year period of
    time; no financial records; evidence pointing to an insurance

25  speculation scheme; and no returns or returns reporting minimal
    income for the relevant period; the Commissioner had little choice

26  but to use the indirect bank deposits method to reconstruct Dodge's
    and Roberts' income.  We do not find the Commissioner's use of the

27  indirect bank deposits method, under the circumstances, to be

28  anything less than reasonable and rationally based."

1 hearings on tax loss; and (3) at his July 6, 2005 sentencing.[21]

2     Looking first at Petitioner's March 11, 2004 Sentencing

3 Memorandum, supported by the expert declaration of CPA and tax

4 expert Dennis Bean, Petitioner contended that the government

5 applied the wrong accounting method, specifically, that the

6 government erroneously used the accrual basis of accounting, not

7 the cash basis. Petitioner also challenged Gathright's ability to

8 testify on behalf of the government. The March 11, 2004 Sentencing

9 Memorandum provides:

> Clearly, based on the evidence, the Defendant was using the accrual method of accounting even though the cash method box was checked on the 1993 tax returns. The Defendant <u>has not</u> changed his method of accounting as the Government argues.
>
> It is significant that Mr. Gathright <u>did not</u> enter this case until just before trial. He was not the auditor in this case nor was he the case agent. He merely came into the case as an expert witness to testify that after examining the case agent's work, the Defendant's tax return was not accurate. Mr. Gathright reviewed the IRS Agent Ken Spute's criminal investigation report which was based upon the bank deposit method, i.e., whatever is deposited in the bank is income. His job was not to do an independent audit based upon an accrual or cash method but merely to substantiate Mr. Spute's report.

(Doc. 124, 3:2-3:19)(citations omitted)(emphasis in original).

---

[21] This showing is also dispositive of Petitioner's challenge under the second prong of *Strickland*. If Petitioner's evidence is the same or substantially similar to what was presented by counsel at sentencing, Petitioner cannot demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687. Petitioner has ignored the substantial evidence that provided a substantial basis for the jury to find he was engaged in criminal activity that provided a major incentive to hide income and not keep complete and accurate accounting records that would disclose the full extent of his financial dealings.

1     On January 27, 2004, the fourth day of evidentiary hearings,

2  Bean testified that the government incorrectly applied the cash

3  system of accounting when it reconstructed Petitioner's income.

4  Bean contended that the government's "mixing" error resulted in

5  double-counting of certain income items and artificially inflated

6  Petitioner's 1994 and 1995 taxable income.  For example, applying

7  the accrual system of accounting, Bean attributed $31,764 of

8  accounts receivables - which accrued in 1993, but were not paid

9  that year - to the 1993 tax year.  In contrast, the government,

10 applying the cash method of accounting, counted the $31,764 in 1994

11 - the year it was received.  These arguments, which are identical

12 to the arguments made by Petitioner's experts in support of this

13 motion, were fully developed during trial counsel's direct

14 examination of Bean and rule out any characterization of

15 Petitioner's counsel as "incompetent" or "deficient" with respect

16 to the accounting issues presented during sentencing:

17     Q:   And in reviewing this, is the income clearly
            reflected on the 1993 return based upon the method
18          used?

19     A:   In my opinion, the return was based – was prepared
            based upon an accrual method of accounting.
20
       Q:   What about the '94?
21
       A:   I couldn't tell from the '94, because I hadn't seen
22          the original records.

23     Q:   How about the '95?

24     A:   '95 would be the same.

25     Q:   Okay.  Why hadn't you seen the original records?

26     A:   I don't know if the original records existed.   I
            don't know what was used to prepare the return.
27
       Q:   That's right, okay.  The records you did look at
28          were reconstructed records?

**26**

A:     The records that we based our decision upon, our opinion on, were reconstructed by us looking at the original acquisition documents from various auction houses and retail outlets where they purchased vehicles, and tracing those vehicles through to a sales document where we looked at the actual sales invoice where there was somebody who purchased the document, a third party.  So in effect, we felt it more important to look at the – confirm the activity through third party confirmations as opposed to what the books and records were showing...

Q:     Now ... you said there was 31,764, accounts receivable?

A:     That's correct.

Q:     What happens with that amount?  What do you do with that?

A:     Well, that receivable would have been a number that would have been subject to collection at some point in the future or if it wasn't collected, it would have been written off...

Q:     How did the IRS treat those unreconciled deposits?

A:     In their analysis, they attempted to include it in the gross income numbers as an adjustment item on the exhibits that they presented to the Court.

Q:     And is that on the cash method or accrual method?

A:     Well, it was an – in essence, it was an attempt to convert the accounting from a cash deposit to accrual method.

Q:     That's only partial conversion.

A:     That's correct.

Q:     So part of this is done on a cash basis and part is done on an accrual basis?

A:     Yes.

Q:     Is that proper?

A:     No, not in my opinion.

(RT, January 27, 2004, 417:8-420:11.)

     More convincing is the January 27, 2004 exchange between CPA

Bean and the court concerning the "mixing" of accounting methods. The exchange, which occurred on the fourth day of evidentiary hearings, forecloses Petitioner's assertion that "it is striking how poorly trial counsel handled ... the amount of tax loss."  It is clear from this exchange that Petitioner's expert provided competent testimony on the two relevant accounting methods, the government's purported errors concerning the application of the cash system of accounting, and attempted to demonstrate - applying an accrual basis of accounting - Petitioner's lack of unreported income for the 1994 and 1995 tax years.  *Strickland* requires no more:

> Court:    So when we start in 1994, we don't know what was done with the – I mean you say that there could be accounts receivable on the '93 sales of $31,764, but there is no evidence to tell us whether that was cash received that they accounted for or didn't account for in '94.

> Bean:     All I'm trying to determine was, was there receivables that could have accounted for some of the cash collections that were received in 1994.   And this schedule shows that there was approximately $31,000 of receivables uncollected from the sales transactions that took place in the month and a half before the end of the year in '93.

> Court:    However, I am going to change the subject slightly.  It was the taxpayer's election to use the cash basis of reporting, the cash method; is that right?

> Bean:     The return was marked "cash basis."   I don't know if the taxpayer – whether or not he chose to check that box "cash" or not.   It's not an elective provision.   Somebody checked that box.   But I'm telling the Court that that box, in '93, while it reflected cash basis, the return does not bear out the fact that it was a cash basis return.

> Court:    But, again, that's for the taxpayer and the taxpayer's accountant or bookkeeper to decide and to do what they think is appropriate under

1                          the law and for business?

2       Bean:       Yes.

3       Court:      And then in 1994, we have the return with a cost
                    of goods sold and the gross income.  Again, the
4                   taxpayer has reported the cash method?

5       Bean:       The taxpayer, the box checked by the taxpayer
                    was cash method.  We do not know if it was a
6                   cash method used on the tax return.

7       Court:      Well, we know that that's what the taxpayer
                    tells us, and we accept that, at least for
8                   purposes of, if you were the Internal Revenue
                    Agent on this, the revenue officer, who were
9                   examining the return, you would look at the
                    return on that basis; it's reported as a cash
10                  basis taxpayer.

11      Bean:       I wouldn't look at the return on that basis,
                    because the regulations and the court cases say
12                  where inventory is a material fact, you are
                    supposed to use the accrual method of
13                  accounting.  That's what the regulations say.
                    And even if the taxpayer checked the box, I
14                  would correct the return to reflect what the
                    regulations called me to do.
15
        Court:      Well, as I heard Mr. Gathright testify, are you
16                  disagreeing with his testimony, that, in effect,
                    he said that the revenue agent had discretion?
17
        Bean:       Yes, I disagree with his position.
18
        Court:      All right.  And you think that the revenue agent
19                  is obligated, under your understanding of its
                    rules and practices, to have recalculated this
20                  return based on an accrual method?

21      Bean:       I believe that the Service was obligated to
                    change the method if they determined that method
22                  was incorrect.  It is based on my experience
                    with the Service of 14 years, both as a field
23                  agent and a supervising examiner, and my
                    experience in public accounting of 23 years.
24
        Court:      As you heard Mr. Gathright's testimony, he says
25                  he ran the calculations and was satisfied that
                    this return was an appropriately prepared
26                  return.

27      Bean:       On the cash method.

28      Court:      On the cash method.

                                    29

1    Bean:       That's correct.

2   (Id. at 427:16-430:11.)

3       This explicitly demonstrates that Petitioner's counsel and the

4   tax expert, Mr. Bean, understood that the accrual method should be

5   applied in an inventory intensive business to defer reportable

6   income to a future year.  Petitioner's contention is contradicted

7   by the record.

8       The transcript of the sentencing proceedings, held on July 6,

9   2005, also demonstrates that trial counsel's performance was within

10  *Strickland's* "wide range of reasonableness."  Much like the habeas

11  experts' support of Petitioner's motion, trial counsel argued that

12  the "mixing" of accounting systems inflated (overstated)

13  Petitioner's income, specifically, the "counting" of accounts

14  receivable in years the items were not "accrued" or reportable.[22]

15  Trial counsel argued that this error, coupled with the government's

16  inclusion of several non-income items (i.e., loans) as income,

17  established that Petitioner did not have unreported income for the

18  1994 and 1995 tax years:

19   Counsel:   All right.  What that was was a hypothetical we
            produced for them.  And what we did in there is
20            put the accrual basis, what came in on the
            accrual basis.  For example, 1993, we have
21   $51,bottom says accounts receivable '93 sales
            31,000.  Okay.  That's based on the accrual basis
22   000 gross sales price.  We ended up, down at the.

23            What the government's done now is for '94, taken
            the accrual basis, the accounts receivable is of
24            no consequence under accrual basis because we're
            reporting all sales.  What they're doing is just
25            taking this hypothetical $266k for '94, taking it

26

27  [22] However, Petitioner's former bookkeeper who prepared
    Petitioner's tax returns, elected the cash basis of accounting for
28  Petitioner's tax returns.  The two tax returns were not amended.

1      from accrual, which is oranges, putting it over
       to the cash, which is apples. I submit you can't
2      do that. They're taking something on accrual
       basis and moving it over to a cash basis. It
3      just doesn't work that way. That's incorrect.
       And that's totally not fair to the defense
4
       [...]
5
       They subtract our the accounts receivable based
6      on the accrual method. Come out to $471k.
       They're saying deposited sales receipts. Then
7      they take it over to cash basis, to their numbers
       of $839,627. And saying the bank records that
8      they analyzed showed there were deposits of that
       amount. Then they take our accrual numbers and
9      subtract that from the cash deposit method.
       That's apples and oranges. You can't mix the two
10     like that...

11     Then they did the same thing for 1995. Yeah, it
       looks real good when you explain it to you first
12     blush, but when you sit back and analyze it. And
       I've done this with Mr. Bean for – over the lunch
13     hour, and we found a number of points. But I
       want to make sure we're verified in what we're
14     saying. They're using accrual part of the way,
       then going back to cash, and then coming back to
15     accrual. That isn't the way it is supposed to be
       done. Yes, the IRS manual says use the best
16     method possible that shows income. Well, you
       don't mix the two.
17
       In the cases I gave you the other day, it says,
18     yes, the IRS can follow -- if they don't have
       adequate books and records, they can choose a
19     method. But they can't be arbitrary. And I'm
       not sure I have a case that said you can't mix
20     the two, but they can't be arbitrary. And I
       submit they're being arbitrary here.
21
Court: This is what I understand is being done. The
22     government has listened to and now are responding
       to the suggestions that Mr. Bean has made about
23     how the accounting should be accomplished. And
       let us remember, let us not lose sight of what we
24     are focused on. We are trying to determine if
       income was not reported in the tax years calendar
25     '94 and '95. And we know what we have records
       that were nonexistent for the most part at the
26     time of trial, and now we have reconstructed
       records that have been primarily assembled and
27     then analyzed by Mr. Bean from Mr. Vartanian's
       former employees[...]
28

                            **31**

And so what is being done is this. And I understand your point about not changing or mixing methods of accounting. But the method of accounting adopted for the tax year in questions is the cash basis. That's an admission.

And those cases say that the taxpayer should be bound by that no matter what the Internal Revenue manual says. But you have now post trial brought into evidence that apparently the bookkeeper mistakenly checked the cash box and was really accounting on the accrual basis. That's what I heard at the last hearing.

Counsel: And that's what the return shows.

Court: All right. Well, and so we are now focused on substance and form. Trying to exalt substance over form.

Counsel: Okay. That's fair.

Court: Now, so whether we use, for the purposes of reporting income and tax calculation, the accrual method or the cash method will, according to everybody, produce some difference.

Now, second and separate question, which you were emphasizing at the last hearing. The income reconstruction method is different. The income reconstruction method is, the law says, that reasonable method that is recognized and that is utilized by the Internal Revenue Service that, under all the circumstances of the particular case, will most reasonably reconstruct the income that has allegedly not been reported because of the failure to keep proper records and failure to document.

And so what we are doing is the government, in effect, has, for the purposes of making it clear, understandable, and I think fair, they have made certain concessions to accounting analysis that Mr. Bean has done and that you have advanced, to try to get the clearest and, again, the most reliable reconstruction of income.

And so the fact that the overall rubric of analysis is the cash deposit method, that's the starting point. There is nothing in the law that I understand to prevent the government from using a hybrid form, in effect, using a modified deposit method as long as it's following proper accounting procedural principles and it isn't doing something that would not be generally accepted in the tax

1                    accounting profession.

2    (RT, July 6, 2005, 18:9-18:23, 88:18-91:11.)

3         This review of the arguments, evidence, and witnesses

4    presented by Petitioner's counsel during the post-trial evidentiary

5    hearings demonstrates that Petitioner's second ineffective

6    assistance of counsel claim necessarily fails.  Although Petitioner

7    brings this motion on the basis of ineffective assistance of

8    counsel, it is apparent that Petitioner's true objective is to

9    directly challenge the tax methodology applied at trial and what he

10   perceives were "vastly inflated tax figures."  The fact that the

11   tax loss issue was contested and complex, does not substantiate

12   Petitioner's view that his counsel was deficient under the first

13   prong of the *Strickland* standard.   Under *Strickland*, counsel is

14   presumed to be competent and Petitioner must rebut this presumption

15   by showing that his performance was objectively unreasonable under

16   prevailing professional norms and was not the product of sound

17   strategy.  *Strickland*, 466 U.S. at 688.  Petitioner has not done

18   so.[23]

19        The record is clear that Petitioner's counsel understood and

20   challenged the accounting methods during the six days of post-trial

21   evidentiary hearings and at sentencing: defense counsel presented

22   the expert testimony of Mr. Dennis Bean, a certified CPA and former

23   IRS Agent; on direct, Mr. Bean testified that Gathright's

24   accounting procedures were flawed and that Petitioner actually had

25

26        [23] "The benchmark for judging any claim of ineffectiveness must

27   be whether counsel's conduct so undermined the proper functioning

     of the adversarial process that the trial cannot be relied on as

28   having produced a just result." *Strickland*, 466 U.S. at 686.

**33**

a tax loss in 1994 and 1995; counsel cross-examined Mr. Gathright, calling his accounting methods erroneous and flawed; and counsel presented arguments and evidence that although the "cash method" box was selected on the tax returns, Petitioner actually applied the accrual tax method in 1994 and 1995.  On similar facts, the Ninth Circuit found counsel to be competent*.  See United States v. Shang*, 220 F. App'x 518, 519 (9th Cir. 2007) ("We reject Shang's ineffectiveness claim [...] because counsel pursued a sound strategy of showing specific errors in the government's calculations for particular tax years, and did not simply present a generalized defense to the indictment.").

In his reply, Petitioner challenges his counsel's alleged failure to adequately investigate the issue of "tax loss."[24]  In

---

[24] Petitioner asserts in his reply that although counsel "vigorously argued the issue of tax loss [he] sensed a problem with the government mixing accrual systems [and] never came close to properly explaining it to the Court."  Nonetheless, the court understood exactly what counsel was trying to establish but did not accept it in large measure because Petitioner's misfeasance created the problems. According to Petitioner, this establishes that counsel needed to retain a separate tax attorney, which he did not do.   Under *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance*." Strickland*, 466 U.S. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001) (finding no deficient performance by counsel who did not retain a ballistics expert on a menacing charge where the same expert had been used in the successful defense of the same defendant on a felon-in-possession charge).  Unlike the cases where the Supreme Court and Ninth Circuit have found *Strickland* error, this is not a case where counsel so neglected his client that "counsel was not functioning as counsel." *Strickland*, 466 U.S. at 687.  Counsel's tactical decisions about experts, witnesses, and Petitioner's defense were reasonable and his decision not to retain additional tax counsel was "a decision well within trial counsel's discretion," especially given that his defense team included two

support, Petitioner cites *Rios v. Rocha*, 299 F.3d 796 (9th Cir. 1999) and *Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994), two cases where the Ninth Circuit found counsel to be "ineffective" under *Strickland*.   However, *Rios* and *Sanders*, two cases involving underlying murder convictions, are distinguishable.   *Rios* differs from this case because counsel failed to obtain the essential facts on which to decide what defense to present on his client's behalf. *See Rios*, 299 F.3d at 806-7 ("[Counsel's] decision to abandon a misidentification defense after having spoken to only one eyewitness and to present instead only an unconsciousness defense, on the basis of one psychological report, constitutes deficient performance.").    *Sanders* is distinguishable because counsel "violated his elementary obligation to inquire into both the facts and the law before determining what was in his client's best interest." *Sanders*, 21 F.3d 1446 ("What makes [counsel's] behavior so inexplicable is that he was presented with an opportunity to obtain exculpatory evidence of critical import to his client, evidence that strongly suggested the most viable defense his client possessed - mistaken identity - and he refused to lift a finger to secure it, or even to ascertain its validity.").   Unlike the counsel in *Rios* and *Sanders*, Petitioner's counsel did not fail to obtain essential facts, as in *Rios*, or "refuse to listen to another person's confession to a crime one's client is accused of committing," as in *Sanders*.    The facts and rulings in *Rios* and

_____

certified public accountants.   Moreover, the record establishes that counsel was focused on the reporting (cash or accrual) basis Petitioner used for Pacific Sales & Leasing and counsel clearly understood and presented the effects on taxable income that result from utilization of the two different methods.

*Sanders* are not helpful or persuasive in this case.

Petitioner has not shown that the performance of his trial counsel fell below the *Strickland* constitutional standard. Although Petitioner concludes that "it is unfair in the extreme to allow such an egregious error to stand," the arguments contained in his habeas motion are the same arguments presented by Petitioner's counsel -- and his tax expert Mr. Bean -- during the post-trial evidentiary hearings, which Petitioner omits from his motion.

More problematic for Petitioner's *Strickland* claim is that the record clearly demonstrates that Petitioner's counsel was conscientious and well-prepared throughout the proceedings; that counsel retained a certified public accountant to testify regarding tax loss, in addition to retaining multiple bookmaking experts; and effectively cross-examined the government's witnesses at trial and in the post-trial evidentiary hearings regarding sentencing. The sentencing record provides an adequate basis to conclude that defense counsel performed "within an objective standard of reasonableness."

Even assuming, *arguendo*, defense counsel rendered deficient performance, Petitioner is not entitled to habeas relief on this issue because he cannot establish prejudice.[25]  Based on the sentencing record, as well as Petitioner's newly proffered

---

[25]  The record demonstrates that Petitioner's counsel was effective during the evidentiary headings and at sentencing. During sentencing proceedings Petitioner presented additional witnesses and evidence demonstrating that Petitioner received no income from Muscles-N-Motion or bookmaking, reducing the amount of "total income tax" in 1994 and 1995.  Counsel's evidence and arguments resulted in the court finding that the government did not meet its burden regarding income from these two sources.

evidence, there is no "probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U .S. at 694.   It is clear that the outcome would have been the same notwithstanding counsel's errors, if they indeed occurred.   There is no prejudice to support Petitioner's ineffective assistance of counsel claim at sentencing.[26]   Petitioner's federal habeas petition is DENIED with respect to the second ground for relief.

## C. Failure to Adequately Research and Inform Court Re: Extraordinary Circumstances Warranting Downward Departure

Petitioner appears to argue that his trial counsel was ineffective because he did not secure a lower sentence based on Petitioner's status as a deportable alien.   Petitioner frames the relevant legal issue as "it is not the fact of deportation/removal per se that justifies a departure [...] but the combination of extraordinary circumstances present in defendant's case and the fact that removal proceedings will certainly be initiated by the government following his incarceration."   Petitioner contends that trial counsel "failed to bring this to the court's attention or adequately research this issue" which he alleges constitutes a

---

[26] Petitioner contends his counsel's failure to understand the "bank deposits method" at sentencing prejudiced him because a proper application of the method establishes that he did not receive any unreported from Pacific Sales & Leasing for the 1994 and 1995 tax years.   However, given that the arguments presented by his new experts are substantially similar or the same as those presented at sentencing, Petitioner's arguments are unavailing. Petitioner also faced a minimum sentence under two counts of making false statements or reports on a loan or credit document or application.

1  violation of his Sixth Amendment rights under *Strickland*.

2       As to *Strickland*'s first prong, Petitioner's argument fails

3  because the record reveals that counsel argued, to a considerable

4  degree, that Petitioner's "extraordinary circumstances" warranted

5  a downward departure.  Petitioner's counsel first raised/developed

6  arguments in support of a downward departure in his "Objections to

7  Presentence Report," filed on April 8, 2004.  (Doc. 124.)  Under

8  the heading "Departure Factors," containing three subsections,

9  counsel argued that a downward departure was warranted in

10  Petitioner's case:

> (A) Since there is not a "loss," Defendant should be
> given a substantial downward departure pursuant to
> Application Note 9(b) in USSG § 2F1.1.
>
> (B) The Defendant should be given a downward departure
> pursuant to § 5H1.6 - Family Ties & Responsibilities.
>
> The Defendant's business is the primary support to his
> elderly parents who cannot speak, read, or write in
> the English language.  The Defendant has been advised
> by the financial institutions, which provide his line-
> of-credit for the business, that if he is incarcerated
> his financing will be terminated and in effect close
> down his business, Pacific Marine Sales.  The
> Defendant meets the criteria set out in the
> Application Notes 1(A) and 1(B) to 5H1.6 and should be
> given a downward departure based upon family ties.
>
> (C) A downward departure should be given pursuant to
> 5H1.2 -Education and Vocational Skill - and/or 5K2.1.3
> - Diminished Capacity.
>
> Dr. Debra Ohanesian examined the Defendant and
> determined that the Defendant cannot function on his
> own when it comes to reading, writing, and anything
> more than simple arithmetic.  Dr. Ohanesian further
> stated that the Defendant is unable to perform in
> English at the level which would be required of him to
> complete business transactions of anything more than
> making change or simply buying and selling merchandise
> at a store.  The Defendant would be unable to read
> contracts or complete his tax forms by himself.

(Doc. 124, 3:17-4:18.)

1    At sentencing, counsel's core argument in support of a
2  downward departure was Petitioner's potential deportation, stating
3  "my concern in this case is deportation [...] what's important is
4  that he receive a sentence of less than 365 days." When prompted
5  for specific circumstances supporting a downward departure, defense
6  counsel responded "well, consider the deportation issue. I mean,
7  that's – if he gets over a year, it's deportation. We have an
8  argument for less than a year." In further support of downward
9  departure at sentencing, counsel specifically mentioned
10 Petitioner's difficulty with the English language, inability to
11 read or write English, his familial relationships, the viability of
12 his boat business, his importance in the community, and his
13 diminished capacity. (RT 115-119, 126-35.) Based on these facts,
14 it is difficult to understand whether Petitioner's habeas counsel
15 read the sentencing record or are simply arguing circumstances they
16 wish had occurred.

17   Petitioner cites *Koon v. United States*, 518 U.S. 81 (1996),
18 and *United States v. Charry Cubillos*, 91 F.3d 1342 (9th Cir. 1996),
19 for the proposition that district courts have discretion to
20 consider whether a downward departure is warranted based on a
21 criminal defendant's alien status. However, despite Petitioner's
22 lengthy and rigorous explanations and arguments regarding his
23 Syrian nationality and risk of deportation, it is unclear how *Koon*
24 or *Charry Cubillos* support his current litigation position. His
25 habeas petition must be analyzed under the *Strickland* standard.
26 Indisputable record evidence demonstrates that his defense counsel
27 argued for a downward departure and forcefully raised the issue of
28 deportation during sentencing. Cutting against Petitioner's

reliance on *Koon* and *Charry Cubillos* for Sixth Amendment relief is the following exchange between Petitioner's counsel and the court on July 6, 2005:

Court:  The request has been made by the defense that Mr. Vartanian be given a downward departure because of his alleged disabilities relating to reading, writing and oral communications, for his family ties and to take into account the necessity of his business and the need to run that business.

In looking at the overall circumstances of the case, the court really cannot find that these circumstances are extraordinary or nature that are not taken into account already...

Counsel:  To go back on the departure, you said the guidelines don't permit it.

Court:  I didn't say they don't permit it. I'm saying that under the guidelines normally taking into account family circumstances, the alleged disabilities and the business, the need for the business to try and keep it running and all of that. I'm saying that those are ordinarily not circumstances that standing alone justify departure.

Counsel:  But I think that this case doesn't fall within that heartland, within those terms that the guidelines set because he does have that inability to read and to write, to have that background like everyone else had...

(RT, July 6, 2005, 130:20-132:10.)

On the instant record, defense counsel for petitioner raised the issue of deportation and argued that Petitioner's "extraordinary circumstances" brought his case "out of the heartland of cases" –– the very inquiry demanded by *Charry Cubillos* and *Koon*. Trial counsel insisted that Petitioner had to be sentenced for less than one year imprisonment to avoid deportability.

Petitioner also contends that counsel's performance was

**40**

constitutionally deficient because he allegedly "did not know and articulate the law on deportation and removal ... which caused substantial prejudice to Mr. Vartanian."  This is categorically untrue.  To the extent Petitioner takes aim at the exchange between his counsel and the lead prosecutor on the purported speculative nature of Petitioner's deportation, this argument is unpersuasive.[27] First, the record forecloses any argument that Petitioner's counsel was ineffective because he did not "correct" the U.S. Attorney's statement that deportation was speculative.  The sentencing record reveals that when U.S. Attorney Cullers asserted that deportation was speculative, Petitioner's counsel stated that "if he gets over a year, it's deportation ... that's the law."  There is no lack of clarity and no misunderstanding that defense counsel recognized and argued against deportability.

Also fatal to Petitioner's argument is that he does not support his argument with any legal authority.  There is nothing in Petitioner's 52-page motion or the accompanying CD-ROM of exhibits and declarations to support the proposition that counsel is required to contemporaneously recite case law citations during oral argument.  The sentencing court was well familiar with the risk of deportation for non-citizens convicted of federal felonies.  In contrast, the record reveals that counsel raised the immigration consequences of a sentence over twelve months, argued that

---

[27] With respect to Petitioner's contentions that the U.S. Attorney "misinformed the Court regarding the law of deportation," it is unclear how the U.S. Attorney's statement that deportation is speculative can be considered "prejudicial misadvisement" resulting in deficient representation under *Strickland*.  Petitioner cites no support for this purported legal theory.

Petitioner was entitled to a downward departure based on his deportable alien status, and correctly articulated the Supreme Court and Ninth Circuit standards of *Koon* and *Charry Cubillos*. There was no constitutionally defective performance. Plaintiff's attempt to expand the outer boundaries of Sixth Amendment jurisprudence is unavailing.

Petitioner has not shown deficient performance under the first prong of *Strickland*. Trial counsel's performance at sentencing fell "within the wide range of reasonable professional assistance" required by *Strickland*. 466 U.S. at 698. Counsel for petitioner presented rigorous arguments that focused on Petitioner's level of culpability, his struggles with the English language, his familial ties, and his importance to the business community. There is also substantial record evidence that counsel argued that a downward departure was warranted because Petitioner was subject to deportation if he served more than one year in federal prison. Counsel competently presented Petitioner's case for downward departure under the sentencing guidelines and the 18 U.S.C. § 3553(a) factors. It cannot be said that counsel's performance was deficient under *Strickland*.

Assuming, *arguendo*, that Petitioner's argument had merit, which it does not, he has not shown prejudice. There was authority to consider a downward departure on the ground that Petitioner faced "extraordinary circumstances," including that he is a deportable alien. *See, e.g., Charry Cubillos*, 91 F.3d at 1342; *United States v. Davoudi*, 172 F.3d 1130 (9th Cir. 1999). The arguments Petitioner argues should have been raised were made. However, it was determined that the facts of Petitioner's case did

not fall outside the "heartland" of the sentencing guidelines. *Charry Cubillos*, 91 F.3d at 1345.

Lastly, Petitioner's third claim for habeas relief is deficient under *Strickland* because his counsel requested - and obtained - a sentence less than the statutory minimum sentence for Petitioner. At sentencing, Petitioner's counsel argued for a more lenient sentence based on Petitioner's limited role and minimum culpability, while referencing facts pertinent to a departure for family ties, deportation, and learning barriers. Although the court found a downward departure inappropriate in this case, the court considered these circumstances and arguments when it sentenced Petitioner to fifteen months in federal prison, below the 18 to 24 month range for his adjusted offense level:[28]

> Now in terms of more than minimal planning, I'm going to say that in the final analysis on the false tax returns, it wasn't sophisticated at all. It was just simply don't have any records, don't report the income and then there's no place to go back and track and try to reconstruct as was done so painfully over almost two years in this court in this sentencing process.

> Moving to counts that are three and four, that are the false statement on a loan or credit application. Candidly, that was -- that was quite outrageous. The falsification of tax returns to state by over $100,000 difference for what the income and operations were for the taxpayer and I don't think that it's fair to say that, well, because Mr. Vartanian may have trouble reading or because he may not speak the English language with such fluency that would permit him to communicate, that going in for an almost $50,000 loan, over $49,000 loan for exotic cars to a lender, you've got two tax returns with you -- that you've signed with really bogus figures on the,. You handed these

---

[28] Petitioner's adjusted offense level was fifteen. Under U.S. Sentencing Guideline 2T4.1, applicable to tax loss cases between $70,000 and $120,000, Petitioner's base offense level was fourteen. One level was added based on grouping principles for the four counts of conviction.

1      to the banker.  You're responsible for that.

2      Now, is there more than minimal planning? Mr. Cullers
       [the  U.S.  Attorney]  gives  an  eloquent  argument.
3      There's  no  question  somebody  was  ingenious.    But
       candidly, I can't find that it was Mr. Vartanian who
4      filled  out  and  completed  those  tax  returns.    Really
       the evidence in this case is to the contrary.  He had
5      other people do the detail work for him.  So probably
       the  sophistication  with  which  this  was  done,  I'm
6      charging him and the jury found that he had knowledge
       of it and I have no question that he had knowledge of
7      the false tax returns.  But I'm not going to hit him
       for  two  additional  levels  for  more  than  minimal
8      planning of sophistication means, In other words, you
       walk in with a false return, you present them to a
9      banker and you get the money.  That was the bottom
       line here.

10
       Now, as to the advisory guidelines which the Court
11     recognizes  are  advisory.    The  calculations  are  as
       follows: I am finding that by clear and convincing
12     evidence, the government has established [...] the
       total tax loss for 1994 [is] $25.093.  For the year
13     1995, there  [...] is a net of $79,335.  The total tax
       loss in this case is $104,428.  The court is required
14     to apply from guideline section 2T4.1 for a tax loss
       more than $70,000 but less than $120,000, the offense
15     level is 14.

16     Under the grouping rules, we are required to count as
       one unit the group with the highest offense level.
17     And in looking at the false statement to a financial
       institution,  the  calculation  of  the  base  under
18     2F1.1(a) is level six.  I'm not finding more than
       minimal planning.  The greater of the adjusted offense
19     levels is the 14.  And for the counting, one unit is
       counted.  And if the group is nine or more levels, it
20     is to be disregarded and to enhance.  And so we have
       one  additional  level,  making  the  total  adjusted
21     offense level in this case a 15.

22     In offense level 15, criminal history category one,
       the sentence is 18 to 24 months.  The request has been
23     made  by  the  defense  that  Mr.  Vartanian  be  given  a
       downward departure because of his alleged disabilities
24     relating to reading, writing, and oral communications,
       for  his  family  ties  and  to  take  into  account  the
25     necessity of his business and the need to run that
       business.
26
       In looking at the overall circumstances of the case,
27     the Court really cannot find that these circumstances
       are extraordinary or are of such a kind or nature that
28     are not taken into account by the guidelines already

                                  **44**

[...]

In the final analysis, the -- quite frankly, the guidelines and the reduction in the income analysis are favorable to Mr. Vartanian. On those two counts [for aiding and abetting the making of false statements], what in effect you'd be doing, if you reduced the level that the probation officer recommended, is you wipe out counting those two additional convictions at all [...]

Under the guidelines, we do have what I think ultimately in this case are among the most important factors. And those are the factors of deterrence and the factors of what statements this makes to the community about the conduct of conviction.

And in the final analysis, it seems to me that we can't separate and simply ignore the facts of the case, the false financial statement crimes, whether or not somebody else was the mastermind. Mr. Vartanian was a knowing participant.

And I think that under the totality of the circumstances of the case, the guideline sentence is the most reasonable sentence under the factors of 3553 and, for those additional purposes, as I've just stated, which will simply tell others in the community that not only do you have your taxes, but you have to pay attention to your business and you can't just do what you want when you want to do it under the terms and conditions that you proscribe. There are rules that also [sic] of is must abide by and that, in the final analysis, is what dictates my sentencing decision.

It is therefore the judgment of the court that the defendant Hagop Vartanian is hereby committed to the custody of Bureau of Prison to be imprisoned for a term of 15 months as to each of Counts One, Two, Three, and Four, all to run concurrently for a total term of imprisonment of 15 months.

(RT, July 16, 2005, 128:8-136:9.)

Petitioner has not met either standard under *Strickland* for ineffective assistance of counsel.[29]   He has not demonstrated

---

[29] In this case, Petitioner was not just convicted of tax fraud. He was also convicted of false financial statement crimes which were so clearly true as to be unchallenged. From tax return income reported to be $13,755 in 1992, $26,726 in 1993, and $29,040

1  erosion of his Sixth Amendment rights to counsel or that counsel's

2  conduct prejudiced his defense or sentence.   Petitioner has not

3  shown  unreasonableness  by  defense  counsel  nor  a  reasonable

4  probability of a different sentence.   The court was fully informed

5  at sentencing about the deportation consequences of a sentence of

6  more than twelve months and chose the most reasonable sentence

7  under the totality of the circumstances.   Petitioner's federal

8  habeas petition is DENIED with respect to the third ground for

9  relief.[30]

10  //

11  //

12  //

13  //

14  //

15  //

16

17  in 1994; the final statement Petitioner signed under oath to the

18  bank.   The income reported was more than $100,000 higher in each
   year.   This conduct includes deceit and moral turpitude.   The

19  illegal  gambling  evidence  showed  Petitioner's  willingness  to
   accommodate the active conduct of illegal sports betting sometimes

20  in his presence and under his authority as owner of the businesses.
   Petitioner has not made a sufficient showing under the second prong

21  of *Strickland*.   He was sentenced below the guideline range of 18

22  months to 15 months based on counsel's sentencing arguments.
   Petitioner did not deserve a less than twelve month sentence.

23

24  [30] In his reply, Petitioner requests an evidentiary hearing "if
   the Court has any doubt about this whatsoever."   An evidentiary

25  hearing is not required "where the files and records conclusively
   show that the movant is not entitled to relief."  *United States v.*

26  *Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998).  Because the record
   conclusively demonstrates that Petitioner is not entitled to

27  *Strickland* relief, an evidentiary hearing is not required.  *See,*
   *e.g., United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir.

28  2004).

## V.   <u>CONCLUSION</u>

For the foregoing reasons, having considered all Petitioner's contentions and grounds for relief, Petitioner's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 is DENIED.

IT IS SO ORDERED.

**Dated:** __**November 9, 2009**__ _____/s/ Oliver W. Wanger_____
UNITED STATES DISTRICT JUDGE